# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 15, 2022

Lyle W. Cayce
Clerk

No. 21-30219

Michael S. Zummer,

*Plaintiff—Appellant*,

*versus*

Jeffery S. Sallet, *Special Agent in Charge, FBI, New Orleans Division, in his individual capacity*; Daniel Halphen Evans, *Assistant Special Agent in Charge, FBI, New Orleans Division, Criminal Branch, in his individual capacity*; Laura A. Bucheit, *Assistant Director, FBI, Security Division, in her individual capacity*; Brigette Class, *former-Deputy Assistant Director, FBI, Security Division, in her individual capacity*; Daniel Powers, *former-Section Chief, FBI, Security Division, in his individual capacity*; Michelle Anne Jupina, *Assistant Director, FBI, Records Management Division, in her individual capacity*; David M. Hardy, *Chief, FBI, Records Management Division, Record/Information Dissemination Section, in his individual capacity*; Michael G. Seidel, *Acting/Assistant Section Chief, FBI, Records Management Division, Record/Information Dissemination Section, in his individual capacity*; Gregory A. Brower, *former Deputy General Counsel, FBI, currently Assistant Director, FBI, Office of Congressional Affairs, in his individual capacity*; Richard R. Brown, *Assistant General Counsel, FBI, in his individual capacity*; Valerie Parlave, *Executive Assistant Director, FBI, Human Resources Branch, in her individual and official capacities*; Federal Bureau of Investigation; David W. Schlendorf, Jr., *Assistant Director, Federal Bureau of Investigation, Human Resources Division, in his individual capacity*; Stephen P. Rees, *Assistant Director, Federal Bureau of Investigation, Records Management Division, in his individual capacity*; Gerald Roberts, Jr., *Assistant Director, Federal Bureau of Investigation, Security Division, in his individual and official capacities*,

*Defendants—Appellees*.

No. 21-30219

---

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:17-CV-7563

---

Before SMITH, ELROD, and OLDHAM, *Circuit Judges*.*

JERRY E. SMITH, *Circuit Judge*:

Former FBI special agent Michael Zummer asked a federal district court to order the FBI to issue him a top secret clearance and reinstate his employment. He also sought damages against FBI officials for revoking his clearance and suspending him, for preventing him from taking other employment while suspended, and for delaying the release of letters that Zummer says contain his protected speech.

The district court dismissed those claims. It concluded that Zummer has no cause of action against the officers in their individual capacities. And it reasoned that its subject matter jurisdiction does not include the power to order the FBI to reinstate Zummer's security clearance. We agree and affirm.

I.

A.

As a special agent, Zummer investigated public corruption in Louisiana. He worked on a high-profile case in which a district attorney was accused of pressuring over twenty women into giving him sexual favors in return for lenient treatment for themselves or their family members. Zummer felt strongly that the evidence that he helped unearth merited a severe charge. But a U.S. Attorney initially declined to bring any charges. Years later, the U.S. Attorney's successor agreed, in a plea deal, to prosecute the

---

* Judge OLDHAM concurs in the judgment and in all of the opinion except part II.C.

No. 21-30219

district attorney for only obstruction of justice—an offense with a three-year maximum sentence.

Zummer was unsatisfied, believing that there was substantial evidence of grave wrongdoing, which made the prosecutor's decision "perplexing." Throughout the process, Zummer perceived self-interested resistance from several government attorneys. He also regarded a high-level prosecutor's apparent personal relationship with a defense attorney as a conflict of interest. So he concluded that the whole process was illegitimate.

Accordingly, Zummer refused to sign the government's draft of the factual basis for the plea. He considered it inaccurate in that it "substantially minimized" the district attorney's wrongdoing. He wished to persuade the presiding court not to accept it.

Zummer's solution was to write the court a letter detailing his concerns. But he recognized that doing so might ruffle feathers at the U.S. Attorney's Office and strain its relationship with the FBI. So he asked his superiors for permission before sending the letter, which emphasized that he was writing "as a private citizen" without authority to communicate the FBI's official position.

Zummer's superiors directed him to get permission from the Department of Justice before sending the letter. Nine days before the former district attorney was due to be sentenced for obstructing justice, Zummer still hadn't heard back. So he changed course. He submitted the letter to the FBI's prepublication review office and requested expedited appraisal.[1] He wanted

---

[1] The FBI prepublication review office screens all FBI personnel's requests to "disclos[e] FBI information outside of their official duty requirements." Federal Bureau of Investigation Information Management Division, *Prepublication Review Policy Guide* 4 (2020), https://vault.fbi.gov/prepublication-review-policy-guide-1065pg/prepublication-review-policy-guide-1065pg-part-01-of-01/view. That office reviews the "legality [and]

No. 21-30219

approval to send the letter to the presiding court and to make it public.

An FBI prepublication reviewer first denied Zummer's requests entirely. Zummer says that that employee later partially relented and offered to work with Zummer to allow the public release of a redacted version of the letter. But the FBI would not clear Zummer to release the letter to the court in any form.

That answer didn't suit Zummer's purpose in drafting the letter. So, having failed to get permission, he took his chances with forgiveness. He sent the letter to the court and told his superiors what he had done.[2]

There was no forgiveness. Zummer says his superiors demanded that he retract the letter and threatened him with discipline. Zummer refused. Instead, he sent the court a second letter, explaining his view that the information in the first letter wasn't protected by privilege.

Zummer's supervisors carried out their threats. They suspended him "from investigative activity" and assigned him to sit alone in an unused office.[3] Then the FBI suspended his security clearance. Though Zummer

---

propriety" of those requests. *Id.*

FBI employees' obligation to get approval before publishing information they learn through their official duties stems, at least in part, from their employment contracts. *See Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam). Zummer doesn't challenge the constitutionality of the prepublication review process generally, but other courts have rejected the contention that prepublication review is an unconstitutional prior restraint of protected speech. *See, e.g., Edgar v. Haines*, 2 F.4th 298, 313–16 (4th Cir. 2021), *cert. denied*, 2022 U.S. LEXIS 2544 (May 23, 2021) (No. 21-791); *Wilson v. CIA*, 586 F.3d 171, 184–85 (2d Cir. 2009); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439–43 (D.C. Cir. 1996).

[2] "There you go. Givin' a f[ig] when it ain't your turn to give a f[ig]." *The Wire: The Target* (HBO television broadcast June 2, 2002).

[3] "[W]hen they ask you where you wanna go—and they are gonna ask you where you wanna go—do yourself a favor: keep your mouth shut." *The Wire: Old Cases* (HBO television broadcast June 23, 2002).

had not disclosed any classified information, FBI management said it could not trust him to learn new classified information because of his "position that information [he] personally gather[s] in the performance of [his] duties . . . may be disclosed [in his capacity] as a private citizen."

FBI special agents must have a "Top Secret Sensitive Compartmented Information Clearance."[4]  So after Zummer's clearance was suspended, his employment was automatically suspended without pay.  But since he was technically still an FBI employee, he remained under its thumb.  He asked for permission to work another job while suspended.  The FBI allowed him to apply for other jobs but prevented him from accepting when one was offered.

Meanwhile, Zummer continued his efforts to publish the letters that he had sent to the court.  The FBI eventually consented to the release of a heavily redacted version of the first letter.  Unsatisfied, Zummer appealed the redactions, but to no avail.

Finally, the FBI permanently revoked Zummer's security clearance.  It explained that Zummer had violated the terms of his employment and was guilty of "untrustworthy or unreliable behavior in the unauthorized release of sensitive government protected information."

## B.

Zummer sued the FBI and everyone involved in managing his employment status or reviewing his requests to send and publish the letters.  He characterized their decisions as retaliation for sending his first letter to the court.  He claimed that was protected speech and that punishing him in

---

[4] FBI Jobs, Special Agent Selection System: All You Need To Know To Apply 2, 9 (2022), https://www.fbijobs.gov/sites/default/files/how-to-apply.pdf.

No. 21-30219

response violated the First Amendment.

Zummer requested five categories of relief. *First*, he sought an injunction ordering the FBI and some of its officers to allow him to publish the unredacted letters.[5] *Second*, he asked the court to reinstate his security clearance and to order him returned to duty.[6] *Third*, he requested compensatory and punitive damages for the delay in publishing his letter.[7] *Fourth*, he solicited compensatory and punitive damages for the adverse employment actions, including the suspension and revocation of his security clearance.[8] *Fifth*, he called for a declaratory judgment establishing that the events described above amounted to unlawful retaliation.

The district court dismissed the claims in the second, third, and fourth categories. It concluded that the Civil Service Reform Act ("CSRA") divests federal courts of subject matter jurisdiction to hear Zummer's claims arising from adverse employment actions. Alternatively, it reasoned that those claims must be dismissed because courts cannot require the Executive Branch to explain its security-clearance decisions. And the court dismissed Zummer's claims arising from his delayed speech, reasoning that those individual-capacity claims arise in a new context, and special factors counsel hesitation in recognizing a cause of action.[9]

---

[5] That category comprises claims against the FBI and defendants Hardy and Rees in their official capacities.

[6] That category comprises claims against the FBI and defendants Parlave and Roberts in their official capacities.

[7] That category comprises claims against Hardy, Jupina, Rees, and Seidel in their individual capacities.

[8] That category comprises claims against defendants Brower, Brown, Bucheit, Class, Evans, Parlave, Powers, Roberts, Sallet, and Schlendorf in their individual capacities.

[9] *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388,

No. 21-30219

The court declined to dismiss the claims seeking unredacted publication of Zummer's letters. It observed that no evidence established that the letters' contents were "classified[ ] or otherwise privileged." The parties then settled those claims. The FBI agreed to allow Zummer to publish the full, unredacted letters. The parties moved for final judgment, and the court agreed.

Zummer appeals the dismissal of his official- and individual-capacity claims arising from the suspension and revocation of his security clearance and the delay in publishing his letters and sending them to the court. His appeal presents two questions. *First*, does the district court have subject matter jurisdiction to hear his challenges to the FBI's security-clearance decisions? *Second*, for claims within the district court's jurisdiction, does Zummer have a cause of action against any of the individual-capacity defendants? The answer to both questions is "no."[10]

## II.

Zummer's First Amendment challenge arises under federal law. Ordinarily, that would end our inquiry into subject matter jurisdiction. *See* 28 U.S.C. § 1331. But where federal employees contest personnel actions, we must also ask whether the CSRA has abrogated the general grant of jurisdiction to the federal courts. *See Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006) (per curiam).

The CSRA "comprehensively overhauled the civil service system." *Lindahl v. Off. Pers. Mgmt.*, 470 U.S. 768, 773 (1985). As relevant here, it cre-

---

395–97 (1971); *Hernandez v. Mesa*, 140 S. Ct. 735, 743–44 (2020).

[10] We review both questions *de novo* because they arise from dismissals under Federal Rule of Civil Procedure 12(b)(1) and (6), respectively. *Ctr. for Biological Diversity v. BP Am. Prod. Co.*, 704 F.3d 413, 421 (5th Cir. 2013).

ated the Merit Systems Protection Board ("MSPB"), a quasi-judicial agency with the power to adjudicate disputes arising from adverse personnel actions taken against covered federal employees. *Id.* at 773–74.[11] The CSRA centralized adjudication of those disputes and replaced a "patchwork" system that was "lengthy," "complicated," and heterogenous. *United States v. Fausto*, 484 U.S. 439, 444–45 (1988) (quotations omitted).

The MSPB's jurisdiction includes review of major adverse personnel actions such as termination, suspensions longer than fourteen days, furloughs, and pay and grade reductions. 5 U.S.C. §§ 7512, 7513(d). It may issue orders "under any law, rule, or regulation." *Id.* § 7701(a). It may order agencies to reinstate employees and provide back pay and attorney's fees. *See id.* §§ 1204(a)(2), 7701(g).

The U.S. Court of Appeals for the Federal Circuit has near-exclusive jurisdiction to review MSPB orders and decisions.[12] There are only two exceptions.

The first exception applies to cases in which covered employees claim that the challenged adverse action was motivated by discrimination prohibited by enumerated civil rights laws.[13] In those discrimination cases, the

---

[11] Zummer was a covered employee. Although FBI agents generally aren't covered by the CSRA subchapter governing review of adverse actions, 5 U.S.C. § 7511(b)(8), that is not true for "preference eligible" FBI employees who have served in the same position for at least a year, *id.* § 7511(a)(1)(B), (b)(8). "[P]reference eligible" employees include veterans who served in enumerated campaigns, including Operation Iraqi Freedom. *Id.* § 2108(1)(D), (3)(B). Zummer is a veteran of the Iraq War and served as a special agent for more than a year before his security clearance was suspended.

[12] *Id.* § 7703(b)(1)(A). The Federal Circuit is directed to "set aside" MSPB orders it finds unlawful or produced by unlawful procedures. *See id.* § 7703(c). It must also discard MSPB factfindings "unsupported by substantial evidence." *Id.*

[13] *Id.* § 7703(b)(1)(B), (2). That exception applies to employment discrimination based on race, color, sex, or national origin (covered by Title VII); discrimination based on

No. 21-30219

employee may seek review in federal district court.[14]

The second exception applies to whistleblower cases. Where a covered employee complains that a personnel action was retaliation for good-faith whistleblowing, he may petition for review of an MSPB order in "any court of appeals of competent jurisdiction," including the Federal Circuit.[15]

In all other covered cases, "a petition to review a final order or final decision of the [MSPB] shall be filed in the . . . Federal Circuit." 5 U.S.C. § 7703(b)(1)(A).

Zummer did not appeal to the MSPB or the FBI's EEO office.[16] But he doesn't dispute that he was a covered employee. Nor does he claim that one of the exceptions to the Federal Circuit's exclusive appellate jurisdiction applies. Instead, he says he didn't appeal to the MSPB because it had no means of providing him relief. Understanding why that's so is critical to understanding Zummer's position.

## A.

Though the MSPB generally can order an agency to reinstate a cov-

---

age (covered by the ADEA); and retaliation for complaints filed under the FLSA. *Id.* § 7703(b)(2). *See also* 42 U.S.C. §§ 2000e-2, 2000e-16(c); 29 U.S.C. §§ 623, 633a(c); 29 U.S.C. §§ 215(a)(3), 216(b).

[14] 5 U.S.C. § 7703(b)(2). An employee may have his claim in such a "mixed case" heard in federal district court by one of three mutually exclusive paths: *First*, he can directly challenge an MSPB decision in a district court; *second*, he can appeal an MSPB decision to the EEOC and then challenge the EEOC's decision in a district court; *third*, he can bypass the MSPB and bring the claim to his employer's EEO office, then to the EEOC, then to a district court. *Punch v. Bridenstine*, 945 F.3d 322, 324–25 (5th Cir. 2019) (explaining that dizzying procedural roadmap in helpful detail).

[15] 5 U.S.C. §§ 2302(b)(8)–(9), 7703(b)(1)(B); *see also, e.g.*, *Baca v. Dep't of the Army*, 983 F.3d 1131, 1137 (10th Cir. 2020).

[16] Oral Argument at 34:57–35:23.

ered employee, Zummer may not just ask it to do that here. The MSPB would have to reinstate his security clearance first. That's a problem for Zummer.

The MSPB lacks authority to "examine the merits of . . . security-clearance denial[s]." *Dep't of the Navy v. Egan*, 484 U.S. 518, 526 (1988). In *Egan*, the Court concluded that the MSPB's jurisdiction is limited to reviewing "adverse actions" as defined by the CSRA. *Id.* at 530. And "[a] denial of a security clearance is not such an 'adverse action.'" *Id.* That's because it is not a "removal, a suspension for more than 14 days, a reduction in grade or pay, [or] a furlough of 30 days or less." *Id.* (quoting 5 U.S.C. § 7512).

For courts to disturb the judgment of the Executive Branch in this area, Congress would have to state its intention clearly. The Constitution textually commits to the President the "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to . . . access . . . such information." *Id.* at 527 (citing U.S. CONST. art. II, § 2).[17] Because that presidential power exists "apart from any explicit congressional grant," *id.*, courts are "reluctant to intrude" "unless Congress specifically has provided otherwise," *id.* at 530.[18] The Court thought it "obvious that no one has a 'right' to a security clearance." *Id.* at 528. Deciding whether to grant a clearance is instead a "[p]redictive judgment [that] must be made by those with the necessary expertise." *Id.* at 529.

So in a case like Zummer's, the MSPB's review would be limited to his suspension and termination. It would note that he lacked a security clear-

---

[17] "The President shall be Commander in Chief of the Army and Navy of the United States . . . ." U.S. CONST. art. II, § 2.

[18] *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . .").

ance, a precondition of the job. That would end the matter.

Zummer says the MSPB's impotence takes him outside the CSRA. He claims the ability to seek immediate judicial review because the CSRA gives him "no means of relief." But Zummer is not the first to try that tack.

## B.

### 1.

The Supreme Court has twice rejected federal employees' attempts to sidestep the CSRA's remedial scheme. In *Fausto*, an employee not covered by this facet of the CSRA attempted to appeal an adverse action to the MSPB on statutory grounds. *Fausto*, 484 U.S. at 441–42. When his appeal was dismissed for want of MSPB jurisdiction, he sued in the Court of Federal Claims under the Back Pay Act, *id.* at 442–43, saying that the MSPB's inability to give him relief left him "free to pursue other avenues of review," *id.* at 449.

The Court disagreed. It described the CSRA's procedural prolixity as "elaborate." *Id.* at 443. In the text and structure of the act, it identified Congress's intent to provide for "a unitary and consistent Executive Branch position on matters involving personnel action" and the "primacy of the . . . Federal Circuit for judicial review." *Id.* at 449. Allowing any employee not afforded a CSRA remedy to seek alternative relief "would seriously undermine" that purpose because it would revive the possibility of agencies' being subject to inconsistent decisionmaking. *Id.* The CSRA is "comprehensive" and the exclusive "system for reviewing personnel action taken against federal employees." *Id.* at 455. Its remedial gaps are intentional and are not for courts to fill. *Id.*

Then, in *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012), the Court considered whether the CSRA also precluded outside constitutional attacks on federal personnel action. Former federal employees wished to challenge a statutory bar to their employment. But the MSPB said it could

not adjudicate facial constitutional challenges to federal laws, so the plaintiffs sued in federal district court.

The Court found no reason to distinguish *Fausto*. It applied the *Thunder Basin* factors to assess whether Congress had impliedly precluded federal court jurisdiction. *Id.* at 16–23.[19] Those factors are "(1) whether a finding of preclusion could foreclose all meaningful judicial review; (2) whether the claims were wholly collateral to a statute's review provisions; and (3) whether the claims were outside the agency's expertise."[20]

*First*, the Court rejected the plaintiffs' contention that they lacked meaningful agency review, despite the MSPB's position that it couldn't assess their claims. *Elgin*, 567 U.S. at 16–21. The Court pointed out that under its appellate jurisdiction, the Federal Circuit could still address those claims "within the CSRA scheme." *Id.* at 21.[21]

*Second*, the Court concluded that a constitutional challenge to a complete bar to employment was germane to the CSRA review scheme. It may be true that the substance of constitutional attack on a statute has little to do with the "day-to-day personnel actions adjudicated by the MSPB," but that challenge is really just "the vehicle by which [the plaintiffs] seek to reverse the removal decisions, to return to federal employment, and to receive the

---

[19] *See also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–16 (1994) (applying the eponymous factors to hold that the Mine Act precluded a district court's original review of a mine operator's statutory and constitutional claims).

[20] *Cochran v. SEC*, 20 F.4th 194, 205 (5th Cir. 2021) (en banc) (quotations omitted), *cert. granted*, 2022 U.S. LEXIS 2425 (U.S. May 16, 2022) (No. 21-1239).

[21] That's despite the procedural complexity required: A claimant would likely have to bring his claim to the MSPB, where it would be dismissed for lack of jurisdiction, appeal that dismissal to the Federal Circuit, have it remanded for further factfinding within established parameters, then appeal again to the Federal Circuit—all for an initial review of the constitutional claim. *Elgin*, 567 U.S. at 19–20; *id.* at 32–33 (Alito, J., dissenting).

compensation they would have earned but for the adverse employment action." *Id.* at 22. And a "challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit." *Id.* That's "[f]ar from . . . wholly collateral to the CSRA scheme." *Id.*

*Third*, the Court reasoned that even if constitutional analysis is "outside the MSPB's expertise," it could still use its expertise to adjudicate "the many threshold questions that may accompany a constitutional claim." *Id.* at 22. Some of those questions may "fully dispose of the case" and avoid the need to address the constitutional issues. *Id.* at 23. Given that none of the *Thunder Basin* factors was present, the Court saw "no reason to conclude that Congress intended to exempt [covered constitutional] claims from exclusive review before the MSPB and the Federal Circuit." *Id.*

Separately, the Court stressed its conclusion that the CSRA was meant to be comprehensive and exclusive. *Id.* at 10–15.[22] The law's exemptions from the exclusive jurisdiction of the MSPB and Federal Circuit show "that Congress knew how to provide alternative forums for judicial review based on the nature of an employee's claim." *Id.* at 13. Its declination to do so in a particular case "indicates that Congress intended no such exception." *Id.* A contrary conclusion would "reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Id.* at 14.

Yet Zummer would have us reach that contrary conclusion. He believes he has identified a gap between the holdings of *Fausto* and *Elgin*.

---

[22] "Just as the CSRA's 'elaborate' framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review." *Id.* at 11 (quoting *Fausto*, 448 U.S. at 443) (internal citation omitted).

No. 21-30219

*Fausto* holds that a statutory claimant denied meaningful review by the CSRA is nevertheless precluded from suit in the district courts. *Elgin* holds that a constitutional claimant entitled to review under the CSRA is precluded from suit in the district courts. What about a constitutional claimant denied review under the CSRA?

2.

We have confronted that question once before. In *Gonzalez v. Manjarrez*, 558 F. App'x 350, 351–52 (5th Cir. 2014) (per curiam), a former Border Patrol agent claimed to have been fired in retaliation for protected speech. But because he was a probationary employee when he was fired, he was "denied any judicial review under the CSRA." *Id.* at 354. So he brought his claim to district court. *Id.* at 351. We held that the CSRA still precluded federal court jurisdiction despite not providing for review of that constitutional claim. *Id.* at 354.

We reasoned that the Court meant what it said in *Elgin* when it declared the CSRA's remedial scheme "exclusive." *Id.* "The Court knew that some [employees] were denied any judicial review under the CSRA." *Id.* And "Congress did not neglect expressly to create a judicial remedy where it wanted one to exist." *Id.* (quoting *Broadway v. Block*, 694 F.2d 979, 984 (5th Cir. 1982)). So any gaps in the CSRA's remedial scheme are intentional; they do nothing to upset its global exclusivity.

*Gonzalez* is not published, so it does not bind us. But we reaffirm it because its reasoning is persuasive, its conclusion being most consistent with *Elgin* and *Fausto*.[23]

---

[23] Zummer says we need not be consistent with *Elgin* and *Fausto* because doing so would deny him a forum in which to adjudicate a colorable constitutional claim. We reject that contention for the reasons we explain *infra* part II.C. What follows is our interpretation

14

No. 21-30219

Only one aspect of *Elgin* is inapposite here: the first *Thunder Basin* factor. The CSRA doesn't provide for "meaningful review" of some of Zummer's claims. *Elgin*, 567 U.S. at 16. The Federal Circuit has interpreted *Egan* to mean that it cannot "examine the merits of a security clearance" decision any more than can the MSPB. *Biggers v. Dep't of the Navy*, 745 F.3d 1360, 1362 (Fed. Cir. 2014). There's no way for Zummer to be reinstated or awarded back pay if he pursues his claim as the CSRA directs.

On the other hand, the Court's analysis of the other two *Thunder Basin* factors applies with full force. Zummer seeks reinstatement of his security clearance merely as a "vehicle" to "reverse" the adverse employment decisions and "return to federal employment." *Elgin*, 567 U.S. at 22.[24] That means his claims are not "wholly collateral to the CSRA scheme." *Id.* The MSPB's expertise is just as relevant to adjudicating any "threshold questions" and related statutory claims here as it was in *Elgin*. *Id.* at 22–23.

Zummer's position is also no answer to *Fausto*'s and *Elgin*'s understanding of the CSRA's text and structure. If the CSRA's review scheme is "exclusive" and provides the sole forum for "reviewing personnel action taken against federal employees," *id.* at 5, and its remedial gaps are "deliberate" congressional policy choices that we are bound to respect, *Fausto*, 484 U.S. at 455, then how are we to use the want of a remedy for Zummer as the sole basis for finding federal court jurisdiction? *See, e.g.*, *McAuliffe v. Rice*, 966 F.2d 979, 980 (5th Cir. 1992). Remember: *Egan* was an interpretation of the CSRA. *See Egan*, 484 U.S. at 530. So we are bound to conclude that

of the CSRA using *Elgin*'s methodology.

[24] Indeed, Zummer seems perfectly content to have us order the FBI to reinstate him without also requiring that he be granted a security clearance. He says, "an FBI agent like [Zummer] investigating Louisiana public corruption investigations has no actual need for a security clearance in performing his duties."

No. 21-30219

Congress did not provide for security-clearance decisions to be reviewed—under the CSRA or otherwise.

After all, the core question under *Thunder Basin* is whether the intent to withdraw federal court jurisdiction is "fairly discernible in the statutory scheme." *Thunder Basin*, 510 U.S. at 207 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). Whether the statute provides for "meaningful review" is merely probative of that question. *See id.* Here, the lack of meaningful review is not enough to overcome the strength of the inference produced by the other two *Thunder Basin* factors and the well-settled, binding implications of the CSRA's text and structure.

\* \* \*

Zummer cannot squeeze through the gap between *Fausto* and *Elgin*. Just as the CSRA precludes extrastatutory review of "adverse actions" defined by Section 7712, it precludes extra-statutory review of ancillary constitutional claims brought as a "vehicle by which [plaintiffs] seek to reverse" those adverse actions. *Elgin*, 567 U.S. at 22.

## C.

Zummer's final riposte is that we can't apply the foregoing statutory-construction principles to his claim because the outcome would deny him "any judicial forum for a colorable constitutional claim"—invoking the Court's enigmatic decision in *Webster v. Doe*, 486 U.S. 592, 603 (1988). Instead, he maintains, we must demand a clearer statement from the CSRA.

In *Doe*, the CIA Director allegedly fired an employee because he was gay. The Director explained that he had done so in the interest of national security. The former employee sued in federal court on both constitutional and statutory grounds. But Congress had empowered the Director "in his discretion [to] terminate . . . [an] employee . . . whenever he shall deem such

termination necessary or advisable in the interests of the United States" "[n]otwithstanding . . . *the provisions of any other law.*"[25]   The government interpreted that provision to preclude judicial review of the Director's decision. *Id.* at 597.

The Court agreed—but only in part.  It concluded that the former employee's claims under the Administrative Procedure Act were barred as "committed to agency discretion by law."  *Id.* at 601; 5 U.S.C. § 701(a)(2). But "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Doe*, 486 U.S. at 603.[26]  That clear-statement rule applied, it said, because of the "'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."  *Id.* (quoting *Bowen*, 476 U.S. at 681 n.12).  And it found no sufficiently clear statement of intent to divest jurisdiction over "colorable constitutional claims." *Id.*

In *Elgin*, the Court declined to apply *Doe*'s clear-statement rule to the CSRA, 567 U.S. at 9–10, because the CSRA did "not foreclose all judicial review of petitioners' constitutional claims"; it channeled them to the Federal Circuit. *Id.* at 10.[27]  As Zummer points out, that's not true here:  Meaningful review of his constitutional claims is entirely foreclosed.

But *Doe* still does not require us to import its clear-statement rule. The Court applied a canon of construction—constitutional avoidance—to a

[25] *Doe*, 486 U.S. at 615–16 (Scalia, J., dissenting) (quoting what was then codified at 50 U.S.C. § 403(c)) (some emphasis deleted).

[26] *See also Johnson v. Robison*, 415 U.S. 361, 373–74 (1974); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986).

[27] The Court evidently considered that review sufficient to satisfy *Doe* despite the ping-ponging path required to bring a constitutional challenge.  *See supra* note 21.

No. 21-30219

statute not relevant here.[28]  That canon "is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). As an "interpretive tool," it needn't be rigidly applied in all contexts.[29]  In particular, "the 'constitutional doubt' doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious." *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998).  There's no need for avoidance "where a constitutional question, while lacking an obvious answer, does not lead [a court] gravely to doubt that [a] statute is constitutional." *Id.*  Accordingly, the Court has declined to extend *Doe* where there were overriding considerations.[30]

---

[28] *Doe* interpreted the National Security Act of 1947.  486 U.S. at 594.

[29] *See, e.g.*, *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 203–207 (1991) (distinguishing between a clear-statement rule mandated by the Eleventh Amendment and one that is merely an "ordinary rule of statutory construction" and declining to apply one of the latter type) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)).  Of course, the sort of clear-statement rule applied in constitutional-avoidance cases cannot arise from "rule[s] of constitutional law." *Id.* at 206.  The premise of the canon is that the applicable rule of constitutional law is unknown.

[30] *See, e.g.*, *Tenet v. Doe*, 544 U.S. 1, 10 (2005).  In *Tenet*, the plaintiffs allegedly were former CIA spies who sued seeking further compensation for past espionage. *Id.* at 1–5.  Some of their claims were constitutional, so they asserted that *Doe* required federal district courts to have original jurisdiction. *See id.* at 5, 10.  The Court disagreed:

> [*Webster* does not] support respondents' claim. . . . [T]here is an obvious difference, for purposes of *Totten*[ *v. United States*, 92 U.S. 105 (1876)], between a suit brought by an acknowledged (though covert) employee of the CIA and one filed by an alleged former spy.  Only in the latter scenario is *Totten's* core concern implicated: preventing the existence of the plaintiff's relationship with the Government from being revealed.  That is why the CIA regularly entertains Title VII claims concerning the hiring and promotion of its employees, as we noted in *Webster*, . . . yet *Totten* has long barred suits such as respondents'.

*Id.* at 9.  As in *Tenet*, the CSRA has long barred suits like Zummer's from the original jur-

No. 21-30219

There are two reasons not to extend *Doe* here. *First*, the foundations of *Doe*'s constitutional doubt have been undermined since it was decided. *Second*, concluding that the CSRA permits federal district courts to exercise original jurisdiction over cases like Zummer's would raise a significant constitutional question of its own.

1.

The Constitution empowers Congress to create lower federal courts.[31] The Court has interpreted that provision as silent on the jurisdiction given to those courts, leaving Congress free to define its boundaries.[32] And Congress has never given the lower federal courts original jurisdiction as broad as the Constitution allows.[33]

---

isdiction of federal courts.

[31] "The judicial power . . . shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1.

[32] *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448–49 (1850). In *Sheldon*, the Court considered the constitutionality of a portion of the First Judiciary Act that excluded federal jurisdiction over cases where diversity of citizenship was created by collusion. *Id.* at 448. The respondent said that statute conflicted with Article III's vesting clause. *Id.* The Court rejected that position:

> It must be admitted, that if the Constitution had ordained and established the inferior courts, and distributed to them their respective powers, they could not be restricted or divested by Congress. But . . . it has made no such distribution . . . . [So] Congress, having the power to establish the courts, must define their respective jurisdictions. . . . Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies. Courts created by statute can have no jurisdiction but such as the statute confers.

*Id.* at 448–49.

[33] *See Gunn v. Minton*, 568 U.S. 251, 256–57 (2013); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823 (1824) (explaining that the Constitution permits Congress to confer jurisdiction on federal courts wherever a federal question "forms an ingredi-

Still, *Doe* appears to have invoked constitutional avoidance from a concern that Congress would intrude on the judicial power by precluding review of "colorable constitutional claim[s]."[34]  But the Court has since repudiated that concern.

A decade after *Doe*, the Court explained that jurisdiction is always antecedent to the exercise of judicial power. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).  So "Congress generally does not infringe the judicial power when it strips jurisdiction."[35]  Here, Congress has withdrawn jurisdiction over a broad class of claims in which federal employees wish to challenge adverse employment actions and ancillary decisions.

Jurisdiction-stripping statutes can still violate specific constitutional provisions. *Patchak*, 138 S. Ct. at 906 n.3.  For instance, a statute violated the Suspension Clause by stripping original jurisdiction to hear habeas corpus applications from prisoners detained extraterritorially.  *Boumediene v. Bush*, 553 U.S. 723, 732–33 (2008).  A roughly analogous situation might have been

---

ent of the original cause").

[34] *Doe*, 486 U.S. at 603.  To explain the canon's relevance, the Court pointed to *Robison*, 415 U.S. at 366–67, where it raised the same concern.  There, the Court had not specified the reason for its hesitation.  *See id.*  But after acknowledging *Sheldon*, it called attention to conflicting opinions expressed by Justices Story and Brandeis.  *Id.* at 366 n.8. Justice Story said, "the whole judicial power of the United States should be, at all times, vested either in an original or appellate form, in some courts created under its authority." *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 331 (1816).  Justice Brandeis said that a "person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality."  *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 84 (1936) (concurring in the judgment).  Presumably, the Court thought those *dicta* clashed with *Sheldon*'s holding.

[35] *Patchak v. Zinke*, 138 S. Ct. 897, 907 (2018) (plurality opinion); *see also id.* at 919 (Roberts, C.J., dissenting) ("[It] is undoubtedly correct . . . . [that] the greater power to create inferior courts generally includes the power to strip those courts of jurisdiction" so long as that power is exercised over "classes of cases" and not individual proceedings.) (quotation omitted, emphasis deleted).

presented here had Congress attempted to deny jurisdiction to hear First Amendment retaliation cases only if the speaker expressed support for a particular cause. Then, the jurisdiction-stripping statute itself might be considered impermissible viewpoint discrimination.[36]

But that's not what Zummer contends. Nor does he advance any reason that categorically stripping jurisdiction to hear cases including constitutional claims would be unconstitutional. Instead, he insists that we must apply *Doe*'s interpretive tool solely because of the established *doubtful* constitutionality of a faithfully construed CSRA. We disagree. In light of the Court's subsequent discussion of the issue and its declination to extend *Doe* in *Tenet*, we are not led "gravely to doubt" that the CSRA's precluding jurisdiction to hear Zummer's claims is constitutionally permissible. *Almendarez-Torres*, 523 U.S. at 239.

### 2.

Even if we had such doubts, we would have countervailing doubts about the constitutionality of the opposite conclusion: that a federal court may decide Zummer's claims arising from the security-clearance decisions.

Zummer asked the district court to hold that the suspension and revocation of his security clearance were pretextual. That's in some tension with *Egan*, 484 U.S. at 526–30, which applied a constitutional-doubt canon of its own to the question whether the MSPB could review security clearance decisions. The district court, relying in part on *Egan*, held that deference to the Executive Branch made Zummer's claims unreviewable independently of

---

[36] *See Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (explaining that governments are almost never permitted to regulate speech "based on 'the specific motivating ideology or the opinion or perspective of the speaker'") (quoting *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).

the CSRA. These federal defendants now ask us to hold that the political question doctrine calls for the same result.

The Constitution textually commits to the President the decision whether to grant someone a security clearance. *Egan*, 484 U.S. at 527. That decision "must be made by those with the necessary expertise in protecting classified information." *Id.* at 529. That reasoning seems to track the first two *Baker* factors for deciding whether a case presents a nonjusticiable political question.[37]

But that doesn't necessarily end the matter. It may be possible, as the Third Circuit has held, to disentangle some claims arising from the security-clearance process from the merits of a security-clearance decision. *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 182–83 (3d Cir. 2010). If so, some of those claims would likely fall squarely within the kinds of cases courts regularly adjudicate.

We do not resolve that question because we read the CSRA to preclude jurisdiction. We note only that there is a serious question about the constitutionality of a district court's deciding claims like Zummer's. So even if we had grave doubts about the constitutionality of precluding judicial review of a class of constitutional claims, it still would not be appropriate to adopt a consciously narrow reading of the CSRA under *Doe*, only to wander right into another constitutional quandary.

Faced with, at most, competing constitutional difficulties, we decline to apply *Doe*'s clear-statement rule. We read the CSRA neither narrowly nor

---

[37] *See Nixon v. United States*, 506 U.S. 224, 228 (1993) ("A controversy is nonjusticiable . . . where there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'") (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

broadly, but faithfully to its text and structure as interpreted by *Fausto* and *Elgin*. As we explained in part II.B, *supra*, that reading compels the conclusion that the CSRA precludes extra-statutory review of Zummer's claims that serve as a vehicle for reversing adverse employment decisions.

### III.

Four of Zummer's claims aren't merely a vehicle for reversing his suspension and termination. They seek damages against individual-capacity defendants for delaying Zummer's speech by refusing to permit him to send or publish his letters. So as the district court correctly concluded, the CSRA does not preclude its subject matter jurisdiction to hear those claims. But the district court was also correct to dismiss those claims on their merits.

Because Zummer doesn't have a statutory cause of action, our first question must be, "Does the First Amendment give rise to an implied right of action for damages against federal officers who violate that Amendment's guarantees?" *Wood v. Moss*, 572 U.S. 744, 757 (2014).

The Court has recognized an implied constitutional cause of action for damages against federal officers in only three contexts.[38] The decision whether to recognize a new such action has two parts. *Hernandez*, 140 S. Ct. at 743. *First*, courts must decide whether the claim arises "in a 'new context' or involves a 'new category of defendants.'" *Id.* (quoting *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). *Second*, if the context is new, courts must ask whether there are any "special factors that counsel hesitation" in recognizing the new cause of action. *Id.* (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (alterations adopted)).

Zummer forthrightly concedes that the context here is new. So the

---

[38] *See Bivens*, 403 U.S. at 395–97; *Davis v. Passman*, 442 U.S. 228, 248–49 (1979); *Carlson v. Green*, 446 U.S. 14, 19–23 (1980).

only question is whether there is any "reason to pause" before hauling FBI management into federal court to explain why they considered information too sensitive to publish immediately. *Oliva v. Nivar*, 973 F.3d 438, 443 (5th Cir. 2020) (quoting *Hernandez*, 140 S. Ct. at 743), *cert. denied*, 141 S. Ct. 2669 (2021).

At least two special factors are present here. *First*, forcing the FBI to defend its preclearance decisions in additional federal litigation will impose "significant [costs]—not only in monetary terms, but also in the time and energy of managerial personnel who must defend their decisions." *Bush v. Lucas*, 462 U.S. 367, 388 (1983). That cost may inappropriately deter FBI managers from making "decisions that they believe to be a correct response" to the risks posed by the release of information. *Id.* at 389.

*Second*, despite enacting a sweeping remedial regime that covers adverse actions against some FBI agents, Congress has not created a cause of action. *See supra* note 11. "[W]e must consider what Congress has done and what Congress has left undone." *Oliva*, 973 F.3d at 444. Where creating a cause of action would impact "the efficiency of the civil service," Congress is better suited to decide whether a cause of action is desirable. *Bush*, 462 U.S. at 389.

Our role is not to weigh those factors against the benefit of remedying constitutional wrongs. Instead, it is to determine whether there *are* any competing interests. Having found two such interests, we decline to recognize a new cause of action under *Bivens*.

\*    \*    \*

Zummer's claims must be dismissed. His claims seeking to reverse his suspension and termination fall outside the district court's subject-matter jurisdiction. And he has no cause of action to bring the remaining individual-capacity claims. The judgment of dismissal is AFFIRMED.