IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 1, 2025 Session

## RANDALL L. RICE ET AL. v. THE TENNESSEE DEMOCRATIC EXECUTIVE COMMITTEE

**Appeal from the Circuit Court for Davidson County**
**No. 24C809   C. David Briley, Judge**

_____

**No. M2024-01155-COA-R3-CV**

_____

A majority of the members of the State Executive Committee of the Tennessee Democratic Party approved adding unelected "ex-officio members" as full members of the Executive Committee with voting rights. A group of dissenting Executive Committee members brought suit, claiming that the addition of voting members of the Executive Committee in this manner violated statutory provisions governing the composition of state party executive committees, codified at Tennessee Code Annotated section 2-13-101 *et seq*. In response, the Executive Committee argued the statutory provisions permit adding ex-officio members as full voting members and invoked constitutional avoidance principles in support of the Executive Committee's interpretation of the statutory scheme. The Executive Committee filed a counterclaim challenging the constitutionality of the statutory scheme based on freedom of association principles. Both parties sought judgment on the pleadings. The trial court granted the Executive Committee's motion for judgment on pleadings, construing the statutory scheme as permitting the Executive Committee's actions. Accordingly, the trial court pretermitted the constitutional issue, dismissing the Executive Committee's counterclaim as moot. The dissenting members appealed. We conclude the trial court erred in its interpretation of the statutory scheme. Accordingly, we reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, P.J., E.S., and W. NEAL MCBRAYER, J., joined.

W. Gary Blackburn, Nashville, Tennessee, for the appellants, Randall L. Rice, Meryl Rice, John Summers, and Erik Huth.

J. Gerard Stranch, IV & Emily E. Schiller, Nashville, Tennessee, for the appellee, The Tennessee Democratic Executive Committee.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Zachary L. Barker, Senior Assistant Attorney General, Nashville, Tennessee, for the State of Tennessee.

**OPINION**

I.

This case concerns a dispute over the composition of the membership of the State Executive Committee of the Tennessee Democratic Party (Executive Committee).[1]  State political party executive committees and related state primary boards are created, structured, and given various legal responsibilities under Tennessee law.  Tenn. Code Ann. § 2-13-101 *et seq*.  In the leadup to the 2024 election, several Executive Committee members proposed that the body should change its bylaws by adding representatives of the Tennessee High School Democrats to the list of organizations granted status as ex-officio members of the Executive Committee.  As part of this proposal, the members of the Executive Committee who were seeking revision of the bylaws asserted that the representatives of the High School Democrats should have full voting privileges as ex-officio members of the Executive Committee.

Other members of the Executive Committee objected to this proposed amendment to the Executive Committee's bylaws.  One member, Randall Rice, voiced concerns about the "legality of adding high school democrats as voting members," observing that it would be difficult to confirm the "bona fide" status of individuals who had never voted in an election.  In doing so, Mr. Rice was referencing a statutory requirement imposed by Tennessee Code Annotated section 2-13-104 for members of state party executive committees.  *See* Tenn. Code Ann. § 2-13-104 ("All candidates for state executive committee membership . . . shall be bona fide members of the political party whose election they seek.").  Another objector to the proposed revisions, John Summers, worried that the Executive Committee did not, consistent with Tennessee law, "have the ability to authorize the addition of ex-officio members to the committee."

These objections were not persuasive to the proponents of changing the bylaws, who continued to voice their support for the proposed amendments.  Responding to criticism of

---

[1] In the discussion that follows, it is necessary to refer both specifically to the State Executive Committee of the Tennessee Democratic Party (the party in the present case) and more generically to state party executive committees under the relevant statutory code provisions.  In doing so, we use capitalization to mark the distinction, with the capitalized "Executive Committee" referring specifically to the party before the court in the present case and the lower case "executive committee" referring to executive committees generically under the statute.

the proposal, supporters of the amendments noted that, under Messrs. Rice and Summers's logic, "all ex-officio members were now on the line because . . . the exclusion of one ex-officio group would mean the exclusion of all ex-officio members." Mr. Rice responded that it might be in the best interest of the Executive Committee to obtain "an opinion [from] the [Tennessee] [A]ttorney [G]eneral [to] aid in answering the question of the legality of all ex-officio members," but that recommendation was opposed and failed a voice vote. Ultimately, the proposal to seat representatives of the High School Democrats as ex-officio members of the Executive Committee with full voting rights passed by more than a two to one margin.

Mr. Rice, Mr. Summers, and additional dissenters (the Dissenting Members) responded by filing suit, seeking a declaratory judgment and injunctive relief. They asserted that the Executive Committee's actions violated Tennessee law. Among their contentions, the Dissenting Members argued that the amendments to the bylaws did not prevent the ex-officio members from voting when the Executive Committee members acted in their capacity as the state primary board. As to this point, the Executive Committee promptly conceded that it would be improper for ex-officio members to vote during primary board sessions. In accordance with this concession, the trial court granted the Dissenting Members' request for injunctive relief on that issue.

Consistent with Mr. Summers's statements during the debate on the proposal, the Dissenting Members also insisted that ex-officio members simply could not be seated in the first place because they were not elected by the primary voters as provided by Tennessee Code Annotated section 2-13-103. The Dissenting Members reiterated Mr. Rice's concern that it would be difficult to confirm a high schooler's "bona fide" status in the absence of any voting record. In the alternative, the Dissenting Members argued that even if the High School Democrats could be named as ex-officio members, they nevertheless should not have voting privileges. The Dissenting Members also asserted that giving "ex-officio members" voting rights would run afoul of the statutory scheme devised by the Tennessee General Asesembly in at least four additional respects. They asserted that the amendments to the bylaws (1) would disturb the legislative intent for equal membership by gender in the Executive Committee, (2) would dilute the votes of elected members and diminish the will of the electorate among the senatorial districts, (3) would immediately change the determination of a quorum and what constitutes a majority, and (4) could create a scenario where ex officio members outnumber and out vote properly elected members.

In response, the Executive Committee insisted its actions were permissible under Tennessee law. The Executive Committee argued that the "Tennessee statute dictates little for the party executive committees" and that it was entirely within the Executive Committee's prerogative to choose "its makeup." The Executive Committee asserted that "[s]tatutes do not take away rights by silence" and that the statutory scheme at issue is silent on the question of ex-officio membership.

The Tennessee Young Democrats obtained permission from the trial court to submit an amicus brief in support of the Executive Committee's position. Therein, the Young Democrats asserted that the Executive Committee has a constitutional right, protected by the First Amendment's guarantee of freedom of association, to organize itself "how [it] see[s] fit." Following the submission of this filing, the Executive Committee aligned itself with the Young Democrats' position by adding constitutional arguments in accordance therewith in support of its contention that the Executive Committee's actions were permissible under Tennessee law. Relatedly, the Executive Committee impliedly invoked the canon of constitutional avoidance in support of its position that the statutory scheme governing it should not be read in a manner that bars it from adding ex-officio members to the membership of the Executive Committee. The Executive Committee also filed a counterclaim, asserting that Tennessee's statutory scheme, if interpreted the way that the Dissenting Members advocated, "would violate its First Amendment right of association granted to it under the First Amendment to the United States Constitution (which further applies to the states through the Fourteenth Amendment), and under Article I, § 9 of the Tennessee Constitution." Neither the Executive Committee nor the Dissenting Members nor the trial court informed the Tennessee Attorney General and Reporter that the constitutionality of a statute had been called into doubt. *But see* Tenn. R. Civ. P. 24.04 ("When the validity of a statute of this state or an administrative rule or regulation of this state is drawn in question in any action to which the state or an officer or agency is not a party, the court shall require that notice be given the attorney general, specifying the pertinent statute, rule or regulation.").

The parties filed cross-motions for judgment on the pleadings. Before ruling on those motions, the trial court requested that the parties address the Tennessee Supreme Court's decision in *Newsom v. Tennessee Republican Party*, 647 S.W.3d 382 (Tenn. 2022) and its implications for this suit. The Dissenting Members argued that the case was largely irrelevant to these proceedings, observing that it mainly concerned whether the Tennessee Open Meetings Act applied to state executive committee meetings. *See Newsom*, 647 S.W.3d at 387. The Executive Committee, however, read the Tennessee Supreme Court's *Newsom* decision as answering the question of whether the statutory scheme at issue prohibited the Executive Committee from granting full voting membership status to members of the Tennessee High School Democrats. In advancing this contention, the Executive Committee relied heavily on the Tennessee Supreme Court's conclusion in *Newsom* that state executive committees and state primary boards "are distinct entities." *See id.*

Having considered the parties' arguments, the trial court concluded that the Executive Committee had the correct understanding of the statutory scheme. In reaching this conclusion, the trial court reasoned as follows:

The Tennessee Supreme Court in *Newsom v. Tennessee Republican Party*

- 4 -

held "that state executive committees and state primary boards are distinct entities with distinct responsibilities." *Newsom v. Tennessee Republican Party*, 647 S.W.3d 382, 386-87 (Tenn. 2022). Implicit in this finding is the conclusion that the statutory limitations on the Executive Committee membership when acting as primary board do not apply when it acts outside that responsibility. Further, no other provision of Tennessee law establishes a limitation on membership of the Executive Committee when it acts outside its responsibility as a primary board.

Because the trial court concluded that *Newsom* impliedly foreclosed the Dissenting Members' position, the trial court did not consider the Executive Committee's arguments regarding whether the First Amendment rendered the statutory scheme unconstitutional. The trial court declined to consider this argument because the Executive Committee's contention was predicated upon a circumstance in which the Dissenting Members' understanding of the statutory scheme was correct; thus, the trial court found the Executive Committee's counterclaim to be moot. The trial court dismissed the Dissenting Members' suit.

The Dissenting Members appealed, raising the following issue: "Whether the Democratic State Executive Committee has the statutory authority to designate members not elected from senatorial districts and afford them the right to vote in Committee matters?" They argue the trial court erred by concluding the Executive Committee has the authority to allow high school students to become full voting members of the Executive Committee through an ex officio status in Tennessee High School Democrats. In opposition, the Executive Committee argues in support of the trial court's ruling and its reasoning. In addition, the Executive Committee asserts that interpreting the statute in the manner suggested by the Dissenting Members would violate the First Amendment and that, consequently, principles of constitutional avoidance demand rejecting the Dissenting Members' interpretation of the statutory scheme. The Executive Committee, however, made clear in its briefing on appeal that because the trial court ruled in its favor based upon statutory interpretation that it is not challenging the trial court's decision to decline to consider its constitutional counterclaim, agreeing that the counterclaim is moot under the trial court's interpretation of the statutory scheme. The parties sent no notice to the Tennessee Attorney General. *But see* Tenn. R. App. P. 32(a) ("When the validity of a statute of this state or an administrative rule or regulation of this state is drawn in question in any appeal to which the state or an officer or agency is not a party, the party raising such question shall serve a copy of the party's brief on the Attorney General.").

A significant portion of the parties' oral arguments centered on whether Tennessee Code Annotated section 2-13-101 *et seq*., if understood as suggested by the Dissenting Members, constitutes an infringement upon the Executive Committee's associational liberty rights under the First Amendment. This led to several colloquies between the court and the parties about the fact that the Tennessee Attorney General had not been notified

about this litigation and questions about whether the most appropriate course of action would be to remand this matter to the trial court to give the Attorney General an opportunity to address the parties' arguments. When asked about whether Tennessee Rule of Civil Procedure 24.04 obligated the parties to inform the Attorney General's office, counsel for the Executive Committee responded, "it definitely probably would've been better if we'd have had the AG involved down at the trial court to begin with." Additionally, counsel for the Executive Committee indicated that "if the court thinks we need to get into those constitutional questions, then . . . it probably would be better" to remand this case to the trial court. Counsel for the Dissenting Members also agreed that the Attorney General ought to have been notified about this case in the trial court.

This court entered an order inviting briefing from the Tennessee Attorney General in accordance with Tennessee Rule of Appellate Procedure 32. We noted that we were "especially interested in understanding the Attorney General's position on whether this case should be remanded to the trial court in order to give the Attorney General an opportunity to address the merits of the interpretive and constitutional arguments in the trial court rather than in this court for the first time on appeal." The Attorney General declined this court's invitation to essentially reset this matter back to its beginning with a full opportunity for the State's participation in these proceedings before the trial court. Instead, the Attorney General's office stated that "[u]nder the particular circumstances of this case—whether the parties' constitutional arguments implicate the constitutional-avoidance *canon of construction*, and where the circuit court previously acknowledged the potential constitutional concern—a remand, in the State's view, would be unnecessary . . . ." The Attorney General noted that this court would not need to reach the First Amendment issue if it agreed with the trial court's construction of the statute. At the same time, the Attorney General also asserted that "the Executive Committee's right of association under the First Amendment compels the statutory construction adopted by the circuit court," effectively taking the Executive Committee's side on the constitutional avoidance question.

Given the odd procedural posture of this case, the lack of prior notice to the Attorney General, and the basis of the decision of the trial court, we do not take the Attorney General's position to be tantamount to an admission that the statutory scheme governing state executive committee membership is unconstitutional under the First Amendment. Such an action would present different considerations than were before the Attorney General in the present case at this stage of the proceedings given the basis of the trial court's ruling and the arguments presented by the parties. *See* Tenn. Code Ann. § 8-6-109(b)(9) (noting the duty of Attorney General "[t]o defend the constitutionality and validity of all legislation of statewide applicability, except as provided in subdivision (b)(10), enacted by the general assembly, except in those instances where the attorney general and reporter is of the opinion that such legislation is not constitutional, in which event the attorney general and reporter shall so certify to the speaker of each house of the general assembly"). Given the response of the Attorney General, essentially waiving any concerns under Rule 24.04

- 6 -

for purpose of the present appeal, we proceed with considering this case on the merits.

## II.

As noted above, in ruling for the Executive Committee, the trial court awarded judgment on the pleadings. When reviewing a trial court's ruling on a motion for judgment on the pleadings, an appellate court uses "the same standard that governs our review of a dismissal under Rule 12.02(6) for failure to state a claim. Therefore, we review de novo a motion for judgment on the pleadings. We accept all the non-moving party's factual allegations as true and draw all reasonable inferences in that party's favor." *Binns v. Trader Joe's E., Inc.*, 690 S.W.3d 241, 246-47 (Tenn. 2024) (citation modified). The Tennessee Supreme Court has further indicated that, in assessing judgments on the pleadings, "[c]onclusions of law are not admitted nor should judgment on the pleadings be granted unless the moving party is clearly entitled to judgment." *Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 296 (Tenn. 2024) (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 769 (Tenn. 1991)). The trial court's rulings on questions of statutory interpretation present questions of law that are reviewed de novo. *Lawson v. Hawkins Cnty.*, 661 S.W.3d 54, 59 (Tenn. 2023).

## III.

Turning to the trial court's interpretation of the statutory scheme, the trial court grounded its conclusion that the statutory scheme permits the Executive Committee to extend full voting membership to members of Tennessee High School Democrats based upon ex officio status therein upon two bases. As the first basis, the trial court concluded the Tennessee Supreme Court's decision in *Newsom v. Tennessee Republican Party*, 647 S.W.3d 382 (Tenn. 2022), is controlling of the issue in the present case in a manner favorable to the actions of the Executive Committee. As the second basis, the trial court relied upon the purported statutory silence regarding ex officio membership of the Executive Committee as indicating that the Executive Committee was free to take this action. We consider both bases in turn, but before doing so, we briefly address what ex officio membership with voting rights means.

The Executive Committee refers in its briefing to ex officio membership almost as if it has a talismanic quality. In truth, the term is not nearly so mystical. Ex officio membership with voting rights simply means that the membership is derived "[f]rom office; by virtue of the office; without any other warrant or appointment than that resulting from the holding of a particular office." *Ex officio*, Black's Law Dictionary 661 (Rev. 4th ed. 1968); *see also*, *e.g.*, *Ex officio*, Balentine's Law Dictionary 438 (3d ed. 1969) ("From or by virtue of the office. A right or privilege in an office arising from one's status as the holder of another office, for example, the right of a justice of the peace to membership on a town board."); *Ex officio*, The American Heritage Dictionary of the English Language

460 (1970) ("By virtue of office or position").[2]  In other words, unless otherwise specified,[3] an ex officio member of a committee is simply a member of the committee with voting rights as a result of holding a particular office or position.

As for the first basis of the trial court's decision, the trial court quite rightly noted that the Tennessee Supreme Court concluded in *Newsom* that the executive committee and the primary board are under the statutory scheme "distinct entities with distinct responsibilities."  *Newsom*, 647 S.W.3d at 387.  These distinct entities have "differing obligations and responsibilities"; they are not synonymous.  *Id*. at 387-88.

The trial court, however, overread a portion of the *Newsom* decision in concluding that the decision was determinative in a manner favorable to the Executive Committee in the present case.  The trial court also failed to address language in *Newsom* that runs contrary to its decision in the present case.  While the state executive committee and state primary board are two distinct entities under Tennessee law, the Tennessee Supreme Court also expressly interpreted the statutory scheme as meaning "that the members of the state executive committee also shall serve as the members of the distinct and separate state primary board."  *Id*. at 388.[4]  Accordingly, the *Newsom* decision suggests that these two

---

[2] In defining the term "ex officio," we have looked to dictionaries contemporaneous with the enactment of the statutory scheme in 1972.  *See* 1972 Tenn. Pub. Acts, c. 740, § 1, ch. 13.

[3]

The term [ex officio] is often misused as a synonym for "nonvoting." Some meetings mistakenly label their regularly invited guests as "ex officio members" when in fact they are not members at all; others mistakenly refer to the nonvoting members as "ex officio members" even though some nonvoting members are present only in an individual capacity and not by virtue of office, or even though some voting members also serve ex officio. But an ex officio member is a voting member unless the applicable governing document provides otherwise.

*Ex officio*, Black's Law Dictionary (12th ed. 2024).

[4] At times, the Executive Committee's briefing seems to conflate statutory obligations and responsibilities of state party executive committees with voluntary actions thereof or even appears to suggest that primary boards, and not state executive committees, are the only entity that has official statutory responsibilities.  There is reason for caution on both accounts.  Regarding the former, the United States Supreme Court has observed that "[t]here can be no complaint that the party's right to govern itself has been substantially burdened by statute when the source of the complaint is the party's own decision to confer critical authority on the State Committee."  *Marchioro v. Chaney*, 442 U.S. 191, 199 (1979).  As to the latter, it is clear that there are statutory obligations and responsibilities for both state executive committees and primary boards.  The Tennessee Supreme Court expressly addressed this point in the *Newsom* decision.  Therein, the Tennessee Supreme Court stated the following:

Various statutory provisions in Title 2 describe the responsibilities of the state executive committees, while other statutory provisions set forth the responsibilities of the state primary boards.  *Compare* Tenn. Code Ann. § 2-13-114(a) (2014) (the state executive

distinct entities are composed of the same people, wearing two different hats, performing two different roles, rather than that their members are different people. Problematically, the trial court concluded, and the Executive Committee conceded both before the trial court and on appeal, that ex-officio members cannot serve on the state primary board.

The second basis of the trial court's decision is the purported statutory silence regarding membership limitations upon the composition of state party executive committees. This purported silence is the central focus of the Executive Committee's argument in support of the trial court's ruling. The problem with the trial court's conclusion and the Executive Committee's argument is that the statute is not silent as to the qualifications of the members of the state party executive committees and how they are chosen. Quite to the contrary, the General Assembly has expressly set forth precisely how a person becomes a member of a state party executive committee. *See* Tenn. Code Ann. § 2-13-103. Tennessee Code Annotated section 2-13-103 provides as follows:

(a) Members of the state executive committee for each party are elected at the regular August primary election immediately before the election of the governor.

(b) In each party's primary its voters in each senatorial district shall elect one (1) man and one (1) woman as members of the state executive committee for terms of four (4) years beginning on September 15 following their election.

---

committees for the parties are urged to jointly establish a calendar of appearances in each county enabling their gubernatorial candidates to appear together); Tenn. Code Ann. § 2-13-110 (2014) (nominating petitions shall be filed by the secretary of state with, among others, the chair of the state executive committee of the candidate's party); Tenn. Code Ann. § 2-13-204(b)(1) (2014 & Supp. 2021) (if a political party's candidate becomes unavailable and the office is to be filled by the voters of the entire state, the party's state executive committee shall determine the method of nomination); Tenn. Code Ann. § 2-10-203(c)(1) (2014 & Supp. 2021) (the state executive committees shall submit nominees for the registry of election finance); Tenn. Code Ann. § 2-14-202(d) (2014 & Supp. 2021) (under certain circumstances, when there is a state senate vacancy, the state executive committee may nominate candidates); *with* Tenn. Code Ann. § 2-17-104 (2014) (candidates shall file any written notice contesting the results of a primary election with the state primary board for their party and the state primary board shall hear and determine the contest); Tenn. Code Ann. § 2-12-103(b)(3) (2014 & Supp. 2021) ("When members of another statewide political party are required to be appointed to a county election commission, they shall be nominated by the party's state primary board."); Tenn. Code Ann. § 2-6-503 (2014) (the state primary boards shall certify the nominees of their parties to the county election commissions); Tenn. Code Ann. § 2-5-208(j) (2014 & Supp. 2021) ("Each state primary board shall prescribe a color for its party's primary ballots which shall be uniform throughout the state and different from every other party's.").

*Newsom*, 647 S.W.3d at 386-87.

(c) Persons elected shall qualify by taking the oath of office and filing it with the coordinator of elections.

In other words, the statutory scheme expressly states how the members of the state executive committees are chosen. They "are elected at the regular August primary election immediately before the election of the governor." Tenn. Code Ann. § 2-13-103(a). The election is by primary voters with each senatorial district electing one man and one woman for a four-year term. Tenn. Code Ann. § 2-13-103(b). Additionally, Tennessee Code Annotated section 2-13-104 requires that "[a]ll candidates for state executive committee membership and for membership in the general assembly shall be bona fide members of the political party whose election they seek." Under the terms of this statutory provision, "[a]ll candidates" for membership on the executive committee must be "bona fide members of the political party," and "[a]ll candidates" seek this position through election. Tenn. Code Ann. § 2-13-104. Tennessee Code Annotated section 2-3-105 does, however, provide for a specified method for temporarily filling vacancies by an alternative route. It states the following:

> Each state executive committee may, by vote of its members, temporarily fill a vacancy in its membership due to death, resignation, disqualification, change of residence, persistent absence from meetings without good cause, or violation of the oath of office until a successor is chosen at the next regular August election.

Tenn. Code Ann. § 2-13-105. Also relevant to the question of membership of the executive committee, Tennessee Code Annotated section 2-13-102(a) provides that "[e]ach political party shall have a state executive committee which shall be the state primary board for the party."

In other words, the statutory scheme is far from silent regarding how the members of the state party executive committees are chosen. Tennessee by statute imposes qualifications for membership on the state party executive committee, specifies the process for the election of members thereof, and sets forth a method for temporary replacement in the event of a vacancy arising. The statutory scheme also specifies that the state executive committee is to be the state primary board, which the trial court found, and the Executive Committee concedes, cannot include members selected through the ex-officio route that it utilized. Relatedly, as stated above, the Tennessee Supreme Court noted in *Newsom* "that the members of the state executive committee also shall serve as the members of the distinct and separate state primary board." *Newsom*, 647 S.W.3d at 388. Accordingly, the trial court's second rationale for its reading of the statutory provision as permitting ex officio membership based upon statutory silence is unavailing.

- 10 -

IV.

The Executive Committee adds, however, an additional basis in support of the trial court's ruling, the constitutional avoidance canon of statutory interpretation. The Executive Committee's argument is grounded in the contention that reading the statutory scheme in the manner advanced by the Dissenting Members would violate associational liberty safeguarded under the First Amendment to the United States Constitution. The trial court expressly noted the possibility that a limitation barring ex officio voting members being added to a state party executive committee "*could* infringe on those rights." The trial court, however, ultimately concluded that it did not need to reach the question of alleged violations of the First Amendment because the statute itself provided for allowing membership by ex officio status. For the reasons discussed above, however, the bases advanced by the trial court for reading the statute in this manner are unavailing.

Therefore, we turn next to considering whether the proper application of the constitutional avoidance cannon renders the trial court's understanding of the statutory scheme correct. The constitutional avoidance canon of statutory construction has an impressive historical pedigree in American law generally and in Tennessee law specifically. Addressing the canon as applied in the federal courts, then Professor, now Justice, Amy Coney Barrett explained that "[u]nsurprisingly, the avoidance canon developed alongside the power of judicial review. . . . The avoidance canon was fashioned by American courts to cope with the power they possessed as a consequence of the newly adopted United States Constitution." Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 139 (2010) (footnote omitted). Because the constitutional avoidance canon emerged out of judicial review as practiced by American courts, the canon "is more an American creation than an English hand-me-down." *Id*. The canon, which is built upon respect for the legislative branch, is at its core grounded in a presumption that legislatures intend to legislate within constitutional bounds. *See* William K. Kelley, *Avoiding Constitutional Questions as a Three-Branch Problem*, 86 Cornell L. Rev. 831, 843-46 (2001).

In the federal courts, the origin of the canon is often traced to Chief Justice John Marshall and his opinion for the United States Supreme Court in *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). *See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *N.L.R.B. v. Cath. Bishop of Chicago*, 440 U.S. 490, 500-01 (1979). As the doctrine became further developed by the 1830s, Justice Story described the operation of the constitutional avoidance canon in the federal courts as follows:

[I]f, upon a just interpretation of the terms thereof, congress have exceeded their constitutional authority, it will become our duty to say so . . . . On the other hand, if the section admits of two interpretations, each of which is within the constitutional authority of congress, that ought to be adopted,

which best conforms to the terms and the objects manifested in the enactment, and the mischiefs which it was intended to remedy. And again, if the section admits of two intended to remedy. And brings it within, and the other presses it beyond the constitutional authority of congress, it will become our duty to adopt the former construction; because a presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous.

*United States v. Coombs*, 37 U.S. 72, 75-76 (1838). In Tennessee, the canon is similarly deeply rooted with its origin in state court statutory interpretation dating well back into the 1800s. *See, e.g.*, *Arrington v. Cotton*, 60 Tenn. 316, 319 (1872). Applying the canon in the 1870s, the Tennessee Supreme Court indicated that "the Courts will never construe a statute unconstitutional if it will admit of any reasonable construction consistent with the Constitution." *Id.*

While the constitutional avoidance canon has an impressive pedigree, applying the doctrine in construing statutory provisions is not without serious dangers. There is in the constitutional avoidance doctrine the possibility of a judicial modesty paradox forming in which courts seeking to act with judicial modesty and to respect the legislature instead exercise powers of the legislature that the courts do not possess and impose limits upon the legislature that do not actually exist under the federal or state constitutions. Such actions improperly aggrandize the courts despite emerging from an attempt to be judicially modest. One of the primary dangers in applying the canon is judicial rewriting of a statute.[5] Hence, the admonition in applying the constitutional avoidance canon that "[c]onstitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 230 (2020). Another significant concern is an overly expansive shadow constitution, or a sort of Constitution-lite, that imposes constraints upon the legislature's ability to govern, not due to actual constitutional constraints, but instead as a result of judicial hunches about the potential unconstitutionality of legislation.[6] Judge Richard Posner explained this latter concern well:

---

[5] *See, e.g.*, Frank H. Easterbrook, *Do Liberals and Conservatives Differ in Judicial Activism?*, 73 U. Colo. L. Rev. 1401, 1405 (2002); Philip P. Frickey, *Getting from Joe to Gene (McCarthy): The Avoidance Canon, Legal Process Theory, and Narrowing Statutory Interpretation in the Early Warren Court*, 93 Cal. L. Rev. 397, 400-01 (2005); Lisa A. Kloppenberg, *Avoiding Serious Constitutional Doubts: The Supreme Court's Construction of Statutes Raising Free Speech Concerns*, 30 U.C. Davis L. Rev. 1, 7 (1996); Ilan Wurman, *Importance and Interpretive Questions*, 110 Va. L. Rev. 909, 913 (2024).

[6] *See, e.g.*, William K. Kelley, *Avoiding Constitutional Questions as a Three-Branch Problem*, 86 Cornell L. Rev. 831, 860-65 (2001).

The practical effect of interpreting statutes to avoid raising constitutional questions is . . . to enlarge the already vast reach of constitutional prohibition beyond even the most extravagant modern interpretation of the Constitution—to create a judge-made constitutional "'penumbra'" that has much the same prohibitory effect as the judge-made (or at least judge-amplified) Constitution itself.  And we do not need that.

Richard A. Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U. Chi. L. Rev. 800, 816 (1983).

In navigating the use of the constitutional avoidance canon when interpreting statutory provisions, courts are between Scylla and Charybdis, where moving to avoid the danger on one side only serves to increase the risk on the other side.[7]  A court that fails to employ the constitutional avoidance canon sufficiently fails to adequately respect the legislative branch and improperly aggrandizes the judiciary; a court that employs the constitutional avoidance canon excessively fails to adequately respect the legislative branch and aggrandizes the judiciary.  Accordingly, in applying the constitutional avoidance canon, courts must seek the right route through the dangers posed by under-using and over-using the canon.

To chart the right route through, there are three essential requirements that must be satisfied before the constitutional avoidance canon should be applied as an interpretive tool.  One, ambiguity must exist within the statutory scheme itself.  The constitutional avoidance canon itself cannot create ambiguity; it is instead a response to statutory ambiguity.  *See, e.g.*, *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001) (indicating that "the canon of constitutional avoidance has no application in the absence of statutory ambiguity"); *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019) (stating that the constitutional avoidance "canon of construction applies only when ambiguity exists"); *United States v. Mills*, 850 F.3d 693, 699 (4th Cir. 2017) (indicating that "as a threshold requirement for the canon to apply, a party must show, using ordinary interpretive methods, that the term is ambiguous and capable of multiple definitions"); *Goodman v. Saline Cnty. Comm'n*, 699 S.W.3d 437, 440 n.5 (Mo. 2024) (en banc) (stating that "ambiguity is required to employ the canon of constitutional avoidance").  Such ambiguity does not arise from a simple first impression sense of a court that the statute may be ambiguous; rather, "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'"  *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Clark v.*

---

[7] In Greek mythology, "Scylla was a ferocious sea-monster whose cave was situated in the Straits of Messina opposite Charybdis, a whirlpool.  Sailors had to navigate their way between these two dangers.  If they steered too hard to avoid one, they would become victims of the other."  *Scylla and Charybdis*, Oxford Dictionary of Reference & Allusion 324 (3d ed. 2012).  A person "who is 'between Scylla and Charybdis' is in a predicament in which avoiding one of two dangers or pitfalls increases the risk of the other."  *Id*.

*Martinez*, 543 U.S. 371, 385 (2005)); *see also*, *e.g.*, *Seila L. LLC*, 591 U.S. at 230 (declining to apply the constitutional avoidance canon where no alternative interpretation was offered that was "rooted in the statutory text and structure").

Two, to adopt an alternative reading of the statute based upon application of the constitutional avoidance canon, the construction that avoids the constitutional concerns must be "a reasonable construction" of the statute. *See*, *e.g.*, *In re Bentley D.*, 537 S.W.3d 907, 910 (Tenn. 2017); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005); *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 522 (Tenn. 1993). In this vein, for more than a century, the Tennessee Supreme Court has recognized the dangers of rewriting statutes under the guise of employing the constitutional avoidance canon and has directed that the interpretive canon is not to be used in such a manner in Tennessee courts. The Tennessee Supreme Court has indicated that the constitutional avoidance canon "does not authorize the court to give to an act an interpretation merely to bring it within the constitutional limitation. Where the act is unambiguous and susceptible of only one interpretation, it must be given that construction, whatever the consequences may be when tested by the Constitution." *Exum v. Griffis Newbern Co.*, 230 S.W. 601, 603 (Tenn. 1921); *see also Shelby Cnty. Election Comm'n v. Turner*, 755 S.W.2d 774, 777-78 (Tenn. 1988) (indicating that a Tennessee court when applying the constitutional avoidance canon "does not have the power to completely re-write or make-over a statute"); *Ellenburg v. State*, 384 S.W.2d 29, 31 (Tenn. 1964); *cf. United States v. Stevens*, 559 U.S. 460, 481 (2010) (stating that, in utilizing the constitutional avoidance canon, "[w]e will not rewrite a . . . law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain" (citation modified)).

Three, the constitutional avoidance canon is not applied based merely upon an assertion by a party of the unconstitutionality of a statute[8] or a mere reflexive hunch of the court that there is a possibility that the measure is unconstitutional.[9] The canon is instead only applied where there are "serious constitutional doubts,"[10] presenting "grave and

---

[8] *See Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 801 (D.C. Cir. 2011) (noting that "[a] clear statute and a weak constitutional claim are not a recipe for successful invocation of the constitutional avoidance canon"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 250 (2012).

[9] *See Zummer v. Sallet*, 37 F.4th 996, 1009 (5th Cir. 2022) (indicating that "[t]here's no need for avoidance 'where a constitutional question, while lacking an obvious answer, does not lead [a court] gravely to doubt that [a] statute is constitutional'" (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998)); *United States v. Stone*, 139 F.3d 822, 836 (11th Cir. 1998) (stating that the constitutional avoidance doctrine "permits the court to read a statute that is 'genuinely susceptible to two constructions . . . after its complexities are unraveled' in a manner that avoids 'a serious likelihood that the statute will be held unconstitutional'" (quoting *Almendarez-Torres*, 523 U.S. at 238)); Scalia & Garner, *supra* note 8, at 250 (stating the level of doubt as to constitutionality "must be 'substantial'").

[10] *Iancu*, 588 U.S. at 397 (quoting *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 516 (2009);

doubtful constitutional questions."[11]

Assuming for purposes of argument that the third requirement for application of the constitutional avoidance canon is satisfied in the present case, the first two requirements for applying the constitutional avoidance canon are still, nevertheless, not satisfied. There is no ambiguity within the statutory scheme itself. Quite to the contrary, the General Assembly through the express terms of the statutory scheme has plainly delineated how a person becomes a member of a state party executive committee. Additionally, the Executive Committee has failed to present any argument based upon conventional statutory interpretation principles for the ambiguity of the statute or the reasonableness of its proposed construction. Furthermore, there is no readily apparent basis under which conventional statutory interpretation methods would result in a reasonable construction of the statute as providing for persons who may not even be eligible to vote in Tennessee elections to become full voting members of a state party executive committee, exercising the legal statutory authority thereof, through an ex officio status as a member of Tennessee High School Democrats.

The Executive Committee's argument for application of the constitutional avoidance canon ignores the actual requirements for application of the canon and instead simply attempts to bootstrap the constitutional concerns. The Executive Committee treats its constitutional concerns as if they were amendments engrafted upon the statutory scheme. Endeavoring to translate the Executive Committee's argument into the proper channels for analysis, its argument is akin to asserting that the statutory scheme must be ambiguous because otherwise it would be unconstitutional and that the Executive Committee's understanding of the operation of the statutory scheme must be a reasonable construction because the statute would otherwise be unconstitutional. That is not an appropriate use of the constitutional avoidance canon, and employing the cannon in this manner would reflect an alarming expansion of judicial power. *See* 16 C.J.S. Constitutional Law § 248 (noting that "the 'canon of constitutional avoidance' comes into play only when, after the application of ordinary textual analysis, a statute is found to be susceptible of more than one construction and the canon functions as means of choosing between them"); *see also* 16A Am. Jur. 2d Constitutional Law § 173 (stating that "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction, and in the absence of more than one plausible construction, the canon simply has no application").

---

*Jennings*, 583 U.S. at 286; *In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *16 n.15 (Tenn. Ct. App. Oct. 13, 2023); *see also* Scalia & Garner, *supra* note 8, at 247-48 (explaining that the canon "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality").

[11] *Gonzalez v. United States*, 553 U.S. 242, 251 (2008); *Jones v. United States*, 529 U.S. 848, 857 (2000); *U.S. ex rel Att'y Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909).

Tennessee courts interpret statutes; we do not rewrite them. *See* Tenn. Const. Art. II, § 3 ("The Legislative authority of this State shall be vested in a General Assembly . . . ."); Tenn. Const. Art. II, § 2 ("No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."); Tenn. Const. Art. VI, § 1 ("The judicial power of this State shall be vested in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish; in the Judges thereof, and in Justices of the Peace."). The Executive Committee's argument invites this court to amend the statute. This we cannot do. Under the constitutional avoidance canon, where a statutory scheme is ambiguous as assessed through conventional methods of interpretation and there is serious doubt as to the constitutionality of a competing construction, courts select the reasonable construction that avoids grave and doubtful constitutional questions. The Executive Committee's approach to the canon would instead render courts a sort of super-legislature empowered to amend statutory schemes. We do not possess such a power. If the statutory provision in the present case was deemed sufficiently ambiguous and the construction was deemed sufficiently reasonable to trigger application of the constitutional avoidance canon, then not only would Tennessee courts have this power, but this power would exist over enormous portions of the Tennessee Code. Such an approach does not follow the proper route through the potential dangers posed by the constitutional avoidance doctrine; it strays entirely too far into excessive use thereof and improper aggrandizement of the powers of the courts.

V.

For the reasons discussed above, we reverse the judgment of the trial court, and we remand for further proceedings consistent with this decision. Upon remand, assuming the Executive Committee's constitutional challenge to the statutory scheme proceeds, the parties are instructed to provide proper notice to the Tennessee Attorney General in accordance with Tennessee Rule of Civil Procedure 24.04 to allow the Attorney General to have an opportunity to determine how to proceed on behalf of the State in responding to the Executive Committee's constitutional challenge to the statutory scheme. The costs of the appeal are taxed to the appellee, the Tennessee Democratic Executive Committee, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE